

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-8-2002

# Rossman v. Fleet Bank RI Natl

Precedential or Non-Precedential:

Docket 1-1094

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Rossman v. Fleet Bank RI Natl" (2002). *2002 Decisions*. Paper 112.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/112

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 8, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1094

PAULA E. ROSSMAN,
individually and for all others similarly situated

v.

FLEET BANK (R.I.) NATIONAL ASSOCIATION,
a nationally chartered bank;
FLEET BANK CREDIT CARD SERVICES, L.P.,
a Rhode Island limited partnership;
FLEET CREDIT CARD HOLDINGS, INC.,
a Delaware corporation;
FLEETBOSTON FINANCIAL CORPORATION,
a Massachusetts corporation

      Paula E. Rossman,
      Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 00-cv-03879
(Honorable Bruce W. Kauffman)

Argued September 5, 2001

Before: SCIRICA, ALITO and BARRY, Circuit Judg es

(Filed: February 8, 2002)

MICHAEL D. DONOVAN, ESQUIRE
 (ARGUED)
Donovan Searles
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania 19103

MICHAEL P. MALAKOFF, ESQUIRE
Malakoff, Doyle & Finberg
The Frick Building, Suite 200
Pittsburgh, Pennsylvania 15219

 Attorneys for Appellant

BURT M. RUBLIN, ESQUIRE
 (ARGUED)
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103

 Attorney for Appellees

OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this Truth in Lending Act case, we must interpret the "no annual fee" provision of a credit card solicitation. Months after plaintiff Paula Rossman responded to a solicitation offering this term, defendant Fleet Bank changed the operable credit agreement and imposed an annual fee. Rossman brought this putative class action alleging, inter alia, that Fleet violated the TILA by failing to disclose the fee later imposed. The District Court dismissed plaintiff 's TILA count for failing to state a claim upon which relief could be granted.[1] We will reverse and remand.

_____

1. See Rossman v. Fleet Bank (R.I.), N.A., No. 00-3879, 2000 WL 33119419 (E.D. Pa. Dec. 29, 2000). The District Court had jurisdiction over plaintiff 's TILA claim under 28 U.S.C.S 1331. We have appellate jurisdiction under 28 U.S.C. S 1292. Because this is an appeal from the granting of a motion to dismiss under Rule 12(b)(6),"[w]e accept all factual allegations in the complaints and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiffs. We may affirm only if it is certain that no relief could be granted under any set of facts which could be proven." Lorenz v. CSX Corp., 1 F.3d 1406, 1411 (3d Cir. 1993).

2

I.

In late 1999, plaintiff Paula Rossman received a"Pre-Qualified Invitation" to obtain a credit card from defendant Fleet Bank.2 The solicitation was for a "Fleet Platinum MasterCard" with a low annual percentage rate 3 and "no annual fee." If interested, the recipient of this offer was to check a box next to which was written, "YES! I want the top card for genuine value and superior savings, the no-annual-fee Platinum MasterCard." An asterisk directed the recipient to a note that stated, "See the TERMS OF PRE-QUALIFIED OFFER and CONSUMER INFORMATION for detailed rate and other information."

The enclosure entitled "Consumer Information" contained the "Schumer Box"--the table of basic credit card information that is required under the Truth in Lending Act, 15 U.S.C. S 1601 et seq., as amended by the Fair Credit and Charge Card Disclosure Act of 1988. Within the Schumer Box, there was a column with the heading "Annual Fee"; the box beneath that heading contained only the word "None." On the "Consumer Information" enclosure, but outside the Schumer box, Fleet listed other fees. Also in that location was the statement, "We reserve the right to change the benefit features associated with your Card at any time."

_____

2. Rossman named four Fleet entities as defendants: Fleet Bank (R.I.) National Association, Fleet Credit Card Services, L.P., Fleet Credit Card Holdings, Inc., and FleetBoston Financial Corporation. As there are no issues in dispute requiring these entities to be differentiated, we will refer to them collectively as "Fleet."

3. It appears Rossman may have received two different credit card offers from Fleet. The one plaintiff appended to her complaint offered a "2.99% fixed APR until May 1, 2000," after which the rate was to rise to a "9.99% fixed APR." That offer expired on November 30, 1999. Fleet submits, and Rossman has not contested, that she actually responded to a second offer, which expired on December 31, 2000. That mailing offered a "7.99% fixed APR," which Fleet emphasized was "not an introductory rate." As we discuss, the card Rossman ultimately received appears to have had a 7.99% APR, suggesting she responded to the second solicitation. As both mailings offered a card with "no annual fee" --the term at issue in this case--the resolution of this appeal does not implicate this ambiguity.

3

Rossman responded to Fleet's offer, and soon thereafter received her "no-annual-fee Platinum MasterCard." It is unclear from her complaint and the documents in the record[4] exactly when this occurred. It appears, however, that she received her card in December of 1999 or January of 2000. Along with the card, Rossman was sent Fleet's "Cardholder Agreement," which contained the following provision concerning annual fees: "No annual membership fee will be charged to your Account."

The Agreement provided for various applicable annual percentage rates charged on outstanding balances, including the standard rate for purchases (7.99%) and several higher rates that could be triggered by certain acts or omissions on the part of the cardholder. Among these was a rate of 24.99% that Fleet was entitled to impose "upon any closure of [the] Account." The Agreement also contained a change-in-terms provision, which stated:

> We have the right to change any of the terms of this Agreement at any time. You will be given notice of a change as required by applicable law. Any change in terms governs your Account as of the effective date, and will, as permitted by law and at our option, apply both to transactions made on or after such date and to any outstanding Account balance.

In May 2000, Fleet sent a letter to plaintiff announcing its intention to change the terms of the agreement. That letter read, in part:

> Over the past several months, the Federal Reserve has been steadily raising interest rates, making it

---

4. While this is an appeal from a Rule 12(b)(6) dismissal, certain documents may be considered in addition to the complaint itself. Exhibits attached to the complaint and upon which one or more claim is based are appropriately incorporated into the record for consideration of a 12(b)(6) motion. Rose v. Bartle, 871 F.2d 331, 340 n.3 (3d Cir. 1989). Furthermore, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff 's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). Neither party disputes that the relevant credit card solicitations and agreements constitute such documents.

4

difficult for credit card issuers to maintain products and services at current rates. While many experts predict that the Federal Reserve will continue to raise interest rates, the regular rate for purchases and balance transfers on your Fleet account remains at a fixed 7.99% APR.

While this rate remains unchanged, a $35 annual membership fee will apply to your account. Effective with billing cycles closing on or after June 1, 2000, the annual fee will appear beginning with your monthly statement that includes the next anniversary date of your account opening.

Soon thereafter, by letter dated June 20, 2000, Fleet announced a modification of its original change. Claiming the move was necessary in light of still further interest rate hikes by the Federal Reserve, Fleet modified the effective date of the change. Rather than waiting until the anniversary of plaintiff 's account opening, Fleet notified Rossman that the annual fee would be imposed almost immediately:

We are modifying the terms of your Fleet Cardholder Agreement only to correct the timing of the annual membership fee previously disclosed. That fee will first be charged to your Account in your billing cycle that closes in July, 2000, and will be charged in that billing cycle each year thereafter.

A thirty-five-dollar fee was charged to Rossman's account by July 6, 2000, in accordance with the second letter.

Rossman alleges that despite Fleet's protestations that it had been effectively forced to cease offering the card without an annual fee, it continued to solicit other new customers with offers for no-annual-fee credit cards. Thus, she contends, Fleet systematically baited new customers with the no-annual-fee offer, while telling its existing customers that the fee increase was necessitated by changing market conditions. These "no annual fee" offers, Rossman alleges, were made by Fleet with the intention of imposing a fee shortly thereafter.

Rossman filed this putative class action on behalf of

5

herself and "[a]ll persons who received or will receive an offer . . . from Fleet . . . for a no annual fee credit card, and who accepted that offer and who were then charged, or have been notified they will be charged, an annual fee."5 She asserts violations of the TILA and Rhode Island law: (1) violation of Rhode Island's Deceptive Trade Practices Act, R.I. Gen. Laws S 6-13.1-1 et seq.; (2) common law fraud; and (3) breach of contract. The essence of plaintiff 's TILA claim is that the original solicitations, insofar as they described the credit card as one with no annual fee, violated the TILA's requirement of accurate disclosure.

Fleet moved to dismiss the TILA count, contending Rossman failed to state a proper claim. Granting the motion to dismiss, the District Court held Rossman's allegations did not state a deficiency in the original disclosures sufficient to constitute a violation under the TILA. Declining to exercise supplemental jurisdiction over the state law claims, the District Court dismissed the suit. Rossman appealed.

II.

The stated purpose of the Truth in Lending Act, which took effect in 1969, is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. S 1601. In pursuit of these aims, the statute requires a series of disclosures that must be made before the consummation (the point at which legal obligations attach) of the underlying credit agreement, as well as at certain other specified times.

Congress included in the Act a provision expressly authorizing the Federal Reserve Board to "prescribe regulations to carry out the purposes of " the TILA. 15 U.S.C. S 1604. The Board promulgated "Regulation Z," 12 C.F.R. S 226, for this purpose. It also published extensive

_____

5. The District Court dismissed the case before considering class certification under Fed. R. Civ. P. 23.

6

"Official Staff Interpretations." 12 C.F.R. Pt. 226 Supp. I. "[T]he Supreme Court has emphasized the broad powers that Congress delegated to the Board to fill gaps in the statute" with these two devices. Ortiz v. Rental Mgmt., Inc., 65 F.3d 335, 339 (3d Cir. 1995). "Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive . . . ." Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565 (1980).

Because the TILA is a remedial consumer protection statute, we have held it "should be construed liberally in favor of the consumer." Ramadan v. Chase Manhattan Corp., 156 F.3d 499, 502 (3d Cir. 1998); accord Begala v. PNC Bank, Ohio, N.A., 163 F.3d 948, 950 (6th Cir. 1998) ("We have repeatedly stated that TILA is a remedial statute and, therefore, should be given a broad, liberal construction in favor of the consumer."); Fairley v. Turan-Foley Imps., Inc., 65 F.3d 475, 482 (5th Cir. 1995) ("The TILA is to be enforced strictly against creditors and construed liberally in favor of consumers . . . .").

In 1988, Congress determined the protections of the TILA with respect to credit and charge cards were inadequate to ensure sufficiently informed use of these credit devices. Congress enacted the "Fair Credit and Charge Card Disclosure Act,"[6] which substantially strengthened the TILA's requirements with respect to credit cards. Significantly, for the first time, it imposed disclosure requirements on credit card applications and solicitations. The TILA now requires applications and solicitations to disclose the annual percentage rates, certain fees (including annual fees), the grace period for payments, and the balance calculation method. 16 U.S.C. S 1637. Before the amendment, the TILA required only that issuers make these disclosures before the opening of the account--a requirement ordinarily fulfilled by providing the disclosures along with the card. See S. Rep. No. 100-259, at 3 (1988), reprinted in 1988 U.S.C.C.A.N. 3936, 3938.

_____

6. "Charge cards" for these purposes are cards, such as the American Express card, that are used to obtain credit, but which do not allow the carrying of a balance from one billing cycle to the next.

The TILA mandates the required terms be "clearly and conspicuously" disclosed. 15 U.S.C. S 1632(a). This standard requires the disclosures to be "in a reasonably understandable form and readily noticeable to the consumer." 12 C.F.R. Pt. 226, Supp. I, cmt. 5a(a)(2); cf. Applebaum v. Nissan Motor Acceptance Corp., 226 F.3d 214, 220 (3d Cir. 2000) (applying a similar standard in a related Consumer Leasing Act case). Certain required terms in credit card disclosure statements--including annual fees-- must be presented within a simple table--the "Schumer Box"--that facilitates easy comparison of credit cards' terms. 16 U.S.C. S 1632(c).

The disclosures are intended to make the terms of the contractual agreement accessible to the consumer. As stated in Regulation Z, "Disclosures shall reflect the terms of the legal obligation between the parties." 12 C.F.R. S 226.5(c). And "[t]he legal obligation normally is presumed to be contained in the contract that evidences the agreement." 12 C.F.R. Pt. 226, Supp. I, cmt. 5(c). Therefore, disclosures should reflect the contractual agreement itself. But the mere inclusion of these terms in the agreement is ordinarily insufficient to meet the disclosure requirements. The purpose of the disclosures is to present the significant terms of the agreement to the consumer in a consistent manner that is readily seen and easily understood, thereby "enabling consumers to shop around for the best cards." S. Rep. No. 100-259, at 3, 1988 U.S.C.C.A.N. at 3938.

The purpose of the TILA is to assure "meaningful" disclosures. 15 U.S.C. S 1601. Consequently, the issuer must not only disclose the required terms, it must do so accurately. The accuracy demanded excludes not only literal falsities, but also misleading statements. See Gennuso v. Commercial Bank & Trust Co., 566 F.2d 437, 443 (3d Cir. 1977) (recognizing violation based on misleading disclosure); see also Taylor v. Quality Hyundai, Inc., 150 F.3d 689, 692 (7th Cir. 1998); Smith v. Chapman, 614 F.2d 968, 977 (5th Cir. 1980) ("A misleading disclosure is as much a violation of TILA as a failure to disclose at all.").

Furthermore, the accuracy of the representations contained in the disclosures is measured at the time those

8

representations are made. "The disclosures should reflect the credit terms to which the parties are legally bound at the time of giving the disclosures." 12 C.F.R. Pt. 226, Supp. I, cmt. 5(c)(1). And, more particularly, "disclosures in direct mail applications and solicitations must be accurate as of the time of mailing." 12 C.F.R. Pt. 226, Supp. I, cmt. 5a(c)(1).

Fleet's statement that the card had "no annual fee" was lawful, therefore, only if it met two conditions. First, it must have disclosed all of the information required by the statute. And second, it must have been true--i.e., an accurate representation of the legal obligations of the parties at that time--when the relevant solicitation was mailed. With this background in place, we turn to the specifics of this case.

III.

Rossman challenges the adequacy of the disclosures in Fleet's credit card solicitation on three related grounds. First, she contends the statute requires not only disclosure of presently imposed annual fees, but also any annual fee that might be imposed in the future. Second, she argues whether or not Fleet was required to disclose future fees, its disclosures failed to meet the requirements of the TILA because they misleadingly suggested there never would be an annual fee. Finally, she asserts Fleet used the disclosures as part of a bait-and-switch scheme, by which it attracted business with the offer for a no-annual-fee card, even though it intended to charge an annual fee on the card soon thereafter. The first challenge goes to the adequacy of Fleet's disclosures; the latter two are more naturally understood as directed at their accuracy.

The District Court rejected plaintiff 's arguments by interpreting the TILA as requiring the disclosure of only annual fees expressly contemplated by the credit agreement as it then existed. And since there was not, at either the time of the mailing of the solicitation or the opening of Rossman's account, an annual fee associated with the card, its statement that there was no such fee was accurate7:

_____

7. The District Court emphasized, however, that the accuracy of the statement, for purposes of the TILA, did not imply the alleged scheme

9

"Fleet's disclosures in late 1999 were accurate with respect to the terms offered at that time; the fact that Fleet allegedly intended to change those terms in the near future did not render the disclosures inaccurate for purposes of the TILA." Rossman, 2000 WL 33119419, at *3. Consistent with this view, Fleet contends it was required to state, in its disclosures, that the card had no annual fee, since any other statement would fail to accurately reflect the underlying agreement, which did not (until modified) permit the imposition of such a fee.

Fleet emphasizes that the requirements at issue here are disclosure requirements. As noted, the disclosures are intended to alert the consumer to the applicable terms of the credit agreement. If there is unlawful manipulation of the underlying terms, that is governed by the substantive law applicable to these agreements. The requirements of the TILA are violated, however, only if the substance of the agreement is not properly disclosed at each point. Fleet maintains that, assuming the facts as alleged by Rossman, the manipulation of the agreements may be wrongful, but the disclosures were accurate reflections of the substance of the agreements at the relevant times, which is all the TILA requires.

Under Fleet's view, it was not required to disclose the annual fee because it did not specify such a fee in the agreement it drafted. That it did not include the term in the agreement was no significant impediment to its imposing the fee because it was able to invoke the change-in-terms provision of the agreement, a provision not itself required to be disclosed. Thus, Fleet contends it was not barred from imposing an annual fee, but did not have to disclose that fact in advance. In essence, then, the interpretation of the TILA urged by Fleet--and adopted by the District Court-- would permit Fleet to effectively avoid its disclosure

_____

was an acceptable course of conduct: "If, as alleged, Fleet lured consumers into opening credit card accounts with relatively favorable terms while intending to switch those terms shortly thereafter, then Fleet unquestionably engaged in wrongdoing." Rossman, 2000 WL 33119419, at *3.

10

obligations by strategic use of a change-in-terms provision. The question is whether the statute permits such a circumvention of its disclosure requirements.

IV.

a. Periodic Fee Disclosure Requirements.

Contending the District Court misinterpreted the TILA with respect to the specific disclosure requirements applicable to periodic fees, Rossman challenges its ruling the TILA requires only disclosures of "presently imposed" fees. The Act requires the disclosure of "[a]ny annual fee, other periodic fee, or membership fee imposed for the issuance or availability of a credit card." 15 U.S.C. S 1637(c)(1)(A)(ii)(I). Regulation Z contains similar--but importantly different--language, requiring disclosure of "[a]ny annual or other periodic fee . . . that may be imposed for the issuance or availability of a credit or charge card." 12 C.F.R. S 226.5a(b)(2) (emphasis added). Fleet was therefore required to provide clear, conspicuous, and accurate notice of the parties' legal obligations with respect to any such fee "that may be imposed for the issuance or availability" of the Fleet Platinum MasterCard.

Rossman contends the language requiring disclosure of any annual fee "that may be imposed" refers to all fees that might ever be imposed. According to Rossman, if Fleet reserves the power to impose fees in the future, as it has, it must disclose all fees it may later impose--including, of course, the thirty-five-dollar annual fee it subsequently imposed.

We decline to read the annual-fee disclosure requirement so broadly. The TILA, as interpreted and implemented by the Federal Reserve Board, permits subsequent changes that do not affect the accuracy of a previous disclosure. E.g., 12 C.F.R. S 226.9(c) ("Whenever any term required to be disclosed under S 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected."); cf. 15 U.S.C. S 1634 ("If information disclosed in accordance with this part is

11

subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part."); 12 C.F.R. S 226.5(e) ("If a disclosure becomes inaccurate because of an event that occurs after the creditor mails or delivers the disclosures, the resulting inaccuracy is not a violation of this regulation, although new disclosures may be required under S 226.9(c)."). It is implicit in these provisions that: (1) ordinarily, a future change in terms need not be anticipated in disclosures; and (2) a failure to disclose does not necessarily foreclose the possibility of such a future change. Rossman's interpretation cannot be squared with this framework.

Furthermore, as the District Court correctly noted, the Federal Reserve Board's use of the word "may" does not compel adoption of plaintiff 's interpretation. The phrase "may impose" means "is permitted to impose" in this context, and not, as suggested by plaintiff, "might impose." Thus, the issuer is required to disclose any fees it is permitted to impose under the applicable agreement. The permissive sense of "may" is more congruous with the structure of the TILA as a whole.

Accordingly, we hold that credit card issuers need not disclose all periodic fees not contemplated by the applicable agreement. Absent a separate basis for requiring the disclosure of the presently disputed fee, therefore, Fleet need not have disclosed it.

b. Duration.

As noted, the TILA prohibits not only failures to disclose, but also false or misleading disclosures. Regardless of Fleet's disclosure obligations, it was not permitted to mislead the recipients of its credit card solicitations into believing that Fleet could not or would not impose such a fee. Rossman asserts Fleet's disclosures were inaccurate and misleading, and hence, violated the TILA's disclosure requirements.

Rossman contends the statement "no annual fee" contains no temporal limitation; it means "no  annual fee

(ever)." This message is strengthened, Rossman argues, by Fleet's advertising the absence of an annual fee as a defining feature of the card. The solicitation plainly described the card as "the no-annual-fee Platinum MasterCard." Under Rossman's view, the disclosures themselves implied that Fleet was indefinitely committed to providing the card free of an annual fee. Because under the cardholder agreement, Fleet was not so committed, the disclosures, as naturally understood, were false, or at least misleading.

Had the solicitations actually stated the offered card would have "no annual fee ever," then Fleet would have violated the TILA, assuming the underlying agreement permitted Fleet to impose such a fee in the future. That statement would have been false--at the time it was made --about the legal obligations of the parties contemplated by the then-relevant agreement. Similarly, had the disclosure said, "no annual fee subject to change at any time, including in the first year," then the disclosure would be perfectly accurate for these purposes. The question is, how should the statement "no annual fee" be interpreted with respect to its duration?

The District Court implicitly understood the statement "no annual fee" as implying no duration at all. For only in light of such an understanding would the District Court be correct in concluding, "Fleet's disclosures in late 1999 were accurate with respect to the terms offered at that time." Rossman, 2000 WL 33119419, at *3 (emphasis removed).8

Because the TILA is a consumer protection act designed to provide easily-understood information to ordinary consumers, it is appropriate to make this determination

_____

8. The District Court did not discuss this issue, so it is unclear how it reached this understanding. It may have done so on the basis of the Official Staff Interpretations' instructions that"disclosures should reflect
the credit terms to which the parties are legally bound at the time of giving of the disclosures." 12 C.F.R. Pt. 226, Supp. I, cmt. 5(c)(1). The legal standard for what is required, however, cannot provide a basis for determining what the disclosures actually mean. The challenge here is not to what Fleet was required to disclose, but what it actually did disclose.

13

from the point of view of the consumer.9  We need not determine whether Rossman is correct that the disclosure implied a permanent promise to refrain from imposing an annual fee. For we believe a reasonable consumer would, at any rate, be entitled to assume upon reading Fleet's solicitation that the issuer was committed to refraining from imposing an annual fee for at least one year. The statement "no annual fee," in other words, is fairly understood to contain an implied term of a year. If Fleet had imposed an "annual fee" of twenty dollars upon the opening of Rossman's account, she would have been entitled to expect that, upon payment of that fee, she would be entitled to a year's use of the card, assuming her other obligations were met. Thus, had Fleet imposed another "annual fee" of thirty-five dollars mid-year, she would surely have been deceived. The original twenty-dollar fee would then not be an annual fee, but simply a fee. Similarly, a reasonable consumer could understand the statement "no annual fee" as describing a promise of (at least) a fee-free year. It would follow that Rossman's credit card was not a no-annual-fee card unless no such fee would be charged for a year. Consequently, Fleet's statement to the contrary would be false or misleading for purposes of the TILA.

In any event, the statement "no annual fee" is not a clear and conspicuous disclosure of a set of contract terms that permit the imposition of an annual fee within a year. Interpreting the statement with an implied annual term is at least as natural as interpreting it with no such term, so the statement is ambiguous at best. And because the TILA, which "should be construed liberally in favor of the

_____

9. We have stated the requirement that disclosures be "reasonably understandable" does not require that they be understandable by the average consumer. Instead, we have said disclosures must be reasonably understandable "in light of the inherent difficulty or complexity of the" information disclosed. Applebaum, 226 F.3d at 220. The appropriate level of difficulty of understanding the disclosure is not an issue here. Instead, the inquiry is into what the disclosures are fairly understood to mean, a question not at issue in Applebaum. In any event, there is nothing complex about annual fees, so the intended audience is the ordinary consumer.

14

consumer," Ramadan, 156 F.3d at 502, is intended to provide clear information to consumers, such ambiguities should be resolved in favor of the consumer. A clear and conspicuous statement of Fleet's authority to change the term at any time would, of course, correct this problem.

Fleet contends such a statement is unnecessary, because the change-in-terms provision of the agreement is not among the terms that must be disclosed under the TILA. The issue here, however, is not Fleet's obligation to disclose the change-in-terms provision, but its obligation to disclose annual fees. And because the statement "no annual fee" was misleading with respect to the duration of the offer, further clarification was necessary for it to meet the requirements of the TILA, assuming the terms of the cardholder agreement actually permitted Fleet to dispense with its no-annual-fee promise mid-year.[10]

This reasoning might, of course, apply as well to the contractual term promising "no annual fee." Rossman has also stated a claim for breach of contract. If the contract itself included such a promise, then the contract might have been breached, but the disclosure statement would presumably be accurate. The disclosure would not, therefore, violate the TILA. The contractual question is not, however, before us and Fleet has taken the position that it was contractually permitted to impose the fee at any time. Therefore, we assume, at this juncture, that the contract did permit Fleet to impose the fee. Under this assumption, a disclosure that implied that Fleet was committed to

_____

10. Fleet's statement on the solicitation disclosure insert that it "reserve[d] the right to change the benefit features associated with your Card at any time" did not clearly and conspicuously clarify the annual-fee term. It was located outside the Schumer Box, on a line with a statement about "Platinum services." The solicitation also included a "cardmember benefit list," which included such items as a "Free-Year-End Account Summary," "Free Rental Car Insurance," and the like. Not included were basic terms such as the APR or fees. Thus, the term "benefit" may reasonably be understood to only include these "extras," and not such features as a lack of an annual fee. Hence, the statement fails to clearly and conspicuously alert the consumer to the fact that the "no-annual-fee" feature could be changed at any time, including within the first year.

refrain from imposing periodic fees for a year would be inaccurate for purposes of the TILA. It would be inaccurate --at the time of the disclosure--with respect to the legal obligations of the parties at that time.

If the cardholder agreement did prohibit the imposition of periodic fees for a least a year, then the facts of this case would be like those presented in DeMando v. Morris, 206 F.3d 1300 (9th Cir. 2000). There, the credit card issuer originally offered a permanent, fixed rate of 10.9%. The issuer sought to raise the rate under the change-in-terms clause in the applicable agreement. By the time the case reached the Court of Appeals, the card issuer admitted the attempt to raise the rate violated the terms of the agreement, insofar as it promised a permanent fixed rate. Under those facts, the original disclosures, which promised a fixed rate, accurately reflected the terms of the underlying agreement at the time they were made. Id. at 1302-03.

The Ninth Circuit concluded, however, that the notice announcing the change of rates violated the TILA, as it disclosed a rate not permitted under the agreement. Id. at 1303. Rossman has not claimed the change-in-terms letter itself violated the TILA. Consequently, her TILA claim will survive only if the agreement permitted Fleet to impose the fee, for if it did not, then the original disclosure would have accurately reflected the agreement so understood.

In sum, because Fleet maintains--and for present purposes we assume--that it had the authority under the cardholder agreement to impose an "annual fee" at any time, the solicitation disclosures, which promised a"no-annual-fee" credit card, did not clearly, conspicuously, and accurately reflect the truth of the matter. A final determination of whether the statement was false or misleading for purposes of the TILA, therefore, will turn on an assessment of the portion of the underlying agreement the statement purports to disclose. If the agreement does not permit modification of an annual fee terms before the completion of the first annual term, the statement"no annual fee" is, as far as this analysis goes, an adequate disclosure. If the agreement did permit such a modification, however, then the disclosure falls short.

16

c. Bait-and-Switch Allegations.

Rossman challenges the District Court's dismissal of her TILA claim on the basis of her assertion that Fleet here engaged in a "bait and switch" scheme. Rossman alleges-- and we must assume the truth of these allegations for purposes of a 12(b)(6) motion--that Fleet solicited her business with the no-annual-fee offer while intending to change the terms shortly thereafter. Rejecting this claim, the District Court held that the legality of such schemes is outside the TILA's narrow focus on disclosure.

The Federal Trade Commission treats advertising in bait-and-switch schemes as false or misleading. 16 C.F.R.S 238 ("Guides Against Bait Advertising "). Regulation Z also addresses these schemes.[11] See 12 C.F.R. S 226.16(a) ("If an advertisement for credit states specific credit terms, it shall state only those terms that actually are or will be arranged or offered by the creditor."); Ralph J. Rohner & Fred H. Miller, Truth in Lending 752 (2000) ("This rule is aimed at the ancient but dishonorable practice of `bait and switch' advertising where the creditor uses the lure of attractive credit terms to induce customers in, but no such favorable terms are in fact available."). Bait advertising, although not necessarily literally false (there is usually a real item described in the advertising), is nonetheless considered deceptive, insofar as it suggests the product advertised is actually offered and intended to be sold, when the real intention is simply to create a contact with the buyer that allows the seller to switch the consumer to a more profitable sale. It is the bait, not the switch, that is deceptive. Hence, the deception occurs at the time of the bait advertisement. Rossman contends Fleet's solicitations contained a deception of this kind, which negates its claim

_____

11. Regulation Z also provides, "The disclosures given in accordance with S 226.5a do not constitute advertising terms for purposes of the requirements of this section." 12 C.F.R. S 226.16(b) n.36d. Therefore, at least much of the information contained in the solicitations may not fall under this rule. Furthermore, the Act does not expressly provide for a private cause of action for violations of the advertising requirements, so it is not clear that Rossman could raise such a claim. See 15 U.S.C. S 1640(a). In any event, Rossman has not alleged a violation of section 226.16.

that the disclosures were accurate at the time they were made.

Citing Clark v. Troy & Nichols, Inc., 864 F.2d 1261 (5th Cir. 1989), the District Court rejected plaintiff 's position. Defendant Troy & Nichols offered to obtain a mortgage for plaintiff Clark on certain terms and the parties entered into an agreement to that effect. Clark was then offered a substantially less advantageous set of terms. Clark refused and the credit arrangement was never consummated.

While accepting that Clark had properly characterized defendants' actions as a bait-and-switch scheme, the Fifth Circuit explicitly rejected bait-and-switch actions under the TILA: "The Truth in Lending Act does not provide a cause of action when a lender engages in `bait and switch' techniques. It does require that the lender make certain disclosures with respect to the offered terms." Id. at 1264. Under this view, the creditor's intention not to offer the originally stated terms is irrelevant to the analysis. So long as the disclosures reflect the stated terms of an agreement, they are accurate under the TILA. And since, in Clark, the terms ultimately agreed to were disclosed before the consummation of the loan there at issue, the requirements of the TILA were met. Cf. Janikowski v. Lynch Ford, Inc., 210 F.3d 765, 769 (7th Cir. 2000) (holding that"spot delivery" schemes, identical in relevant respects to bait-and-switch schemes, do not violate the TILA).

The District Court here adopted this approach, stating, "Fleet's disclosures in late 1999 were accurate with respect to the terms offered at that time; the fact that Fleet allegedly intended to change those terms in the near further did not render the disclosures inaccurate for purposes of the TILA." Rossman, 2000 WL 33119419, at *3.

In one sense, the solicitation disclosures here were accurate--the agreement then referred to by the disclosures did not contemplate an annual fee. But in another sense, if Fleet intended to impose an annual fee shortly thereafter, the disclosures were at least misleading. A reasonable consumer would expect that, even if the terms may change, the stated terms are those that the card issuer intends to provide. The disclosures--we assume for these purposes--

18

feigned an intention to provide credit under a set of terms that Fleet did not intend to provide over time. Thus, even if the language of the disclosures did not imply that Fleet was obligated for at least a year, the disclosures were misleading with respect to Fleet's alleged intentions. As the dissent in Clark noted, such a deception may, in some ways, be worse than simply inaccurate disclosures:

> The majority concludes that even though the lender never intended to extend credit on the terms disclosed, the accuracy of the disclosures remain untainted. In my view, an intention from the outset not to extend credit on disclosed terms is far more egregious than inaccurate terms. On careful review of the disclosures, one might detect an inconsistency between the interest rate promised and the amortization schedule disclosed. By contrast, there is no way to enter the lender's mind to determine whether he means what he discloses.
>
> Disclosures feigning one's true intention, in my view, are inaccurate.

864 F.2d at 1266 (Thornberry, J., dissenting).

Because the TILA is to be construed strictly against the creditor, Ramadan, 156 F.3d at 502, it is at least debatable that the dissent had the better understanding of the accuracy required by the TILA. We need not enter that particular debate, however, because we believe, in any event, this case is distinguishable from Clark .

Clark was a classic bait-and-switch case. The plaintiff there was first attracted by a deceptive offer. Having obtained his audience, the lender attempted to switch the offer to a set of terms more favorable to itself and less favorable to the borrower. All of this occurred before the consummation of an agreement. Clark was able to, and chose to, refuse the switch based on accurate disclosures. He was never a party to a credit agreement whose terms were not adequately disclosed.

The disclosures at issue in Clark were initial disclosures --disclosures that must be made by a specified time before the consummation of the agreement. With respect to the terms actually offered, disclosure was achieved by the

19

second disclosure statement. The first statement did not accurately reflect the terms of the agreement ultimately offered, but the second statement provided Clark with fully adequate disclosure before an agreement was reached, providing Clark with the opportunity to accept or decline the proposed agreement on the basis of full information. Armed with that information, he chose not to enter into an agreement.

Here, by contrast, the original disclosures were not corrected before Rossman entered into the agreement. These disclosures remained the relevant disclosures of the agreement ultimately reached. But it is essential to the TILA's purposes that consumers be informed of the basic conditions of credit before they enter a credit relationship. As the second disclosures in Clark did provide adequate information before consummation, these concerns were not implicated there.

This bait-and-switch case, therefore, goes beyond standard bait-and-switch cases such as Clark. The switch here did not occur as the result of a sales tactic before the formation of the contract, but by invoking an undisclosed term in an existing contract. Rossman entered the agreement without the benefit of disclosure of what she alleges was Fleet's intended annual fee. To the extent the original disclosures were corrected by the notice of change, this correction happened only after Rossman had used, and been bound by, the agreement for several months. Had Rossman received the notice of the change in the form of an initial notice before opening her account, she would have been subject to a classic bait-and-switch analogous to Clark, and would have found herself in a correspondingly less disadvantageous position.

Significantly, it would appear that Rossman was not entirely free, following notice of the pending imposition of the annual fee, to walk away from her credit arrangement in the same way that Clark was upon receiving his second set of disclosures. Credit card holders may have balances they are unable to pay off within a month. And if Rossman did attempt to cancel the card while carrying a balance, Fleet retained the contractual authority to assess a 24.99% APR on the remaining balance. Therefore, there may have

20

been no way to avoid incurring the obligation to pay the annual fee under the changed contract. As such, the notice of change was correspondingly less valuable than initial disclosure of the annual fee would have been.

Furthermore, Congress has imposed special requirements on credit card solicitations that did not apply to the mortgage in Clark. Not only must issuers disclose the basic terms of the agreement prior to consummation ("initial disclosures"), they must additionally12 disclose--clearly, conspicuously, and accurately--many of those terms in the solicitation itself ("solicitation disclosures" or "early disclosures").13 These requirements are unique to credit and charge cards.14 They seek to ensure that consumers have the information needed to make informed choices with respect to credit cards not only before the agreement is consummated, but also at the (generally earlier) point at

_____

12. While distinct requirements apply to solicitation disclosures, and to initial disclosures, the credit card issuer may fulfil both requirements with the same instrument:

> Combining disclosures. The initial disclosures required by S 226.6 do
> not substitute for the disclosures required by S 226.5a; however, a
> card issuer may establish procedures so that a single disclosure
> statement meets the requirements of both sections. For example, if
> a card issuer in complying with S 226.5a(e)(2) provides all the
> applicable disclosures required under S 226.6, in a form that the
> consumer may keep and in accordance with the other format and
> timing requirements for that section, the issuer satisfies the initial
> disclosure requirements under S 226.6 as well as the disclosure
> requirements of S 226.5a(e)(2).

12 C.F.R. Pt. 226, Supp. I, cmt. 5a-2.

13. We recognize that the TILA contains a kind of early disclosure requirement for mortgages, like the one at issue in Clark. 16 U.S.C. S 1638(b)(2) (requiring disclosures "not later than three business days after the creditor receives the consumer's written application"). That provision, however, simply changes the timing of the initial disclosures. It is not an additional requirement, as is the credit card solicitation disclosure requirement.

14. Because credit card rates did not decline along with other interest rates during the 1980s, and were among the most profitable loans during that period, Congress singled out credit cards for special treatment. See S. Rep. 100-259, at 2, 1988 U.S.C.C.A.N. at 3937.

21

which they are considering responding to an issuer's solicitation.

Under the approach urged by Fleet, a credit issuer would be able to disclose any terms it wanted to, with no intention ultimately to offer those terms. It could send, together with the card, a new set of disclosures stating the terms it had always actually intended to provide. Fleet's approach would have the potential to render the solicitation disclosure requirements created by the 1988 amendments to the TILA entirely ineffectual. Misleading early disclosures would serve no informative purpose. And worse, the additional disclosure requirement mandated by Congress--for the purpose of encouraging informed consumer choices--could be used for the purpose of deceiving consumers.

The Federal Reserve Board has determined that when a credit card issuer offers rates or fees that are reduced or waived for a limited period of time, the issuer must disclose the applicable rate or fee that will apply indefinitely, and is permitted to disclose introductory rates only if the period of time in which the rate or fee is applicable is also disclosed. 12 C.F.R. Pt. 226, Supp. I, cmt. 5a(b)(1)-5 (introductory rates); cmt. 5a(b)(2)-4 (waived or reduced fees). 15 Thus, as

_____

15. These comments, in full, read as follows:

> Introductory rates--discounted rates. If the initial rate is temporary
> and is lower than the rate that will apply after the temporary rate
> expires, the card issuer must disclose the annual percentage rate
> that would otherwise apply to the account. In a fixed-rate account,
> the card issuer must disclose the rate that will apply after the
> introductory rate expires. In a variable-rate account, the card issuer
> must disclose a rate based on the index or formula applicable to the
> account in accordance with the rules in S 226.5a(b)(1)(ii) and
> comment 5a(b)(1)-3. An initial discounted rate may be provided in
> the table along with the rate required to be disclosed if the card
> issuer also discloses the time period during which the introductory
> rate will remain in effect.

> Waived or reduced fees. If fees required to be disclosed are waived
> or reduced for a limited time, the introductory fees or the fact of fee
> waivers may be provided in the table in addition to the required fees
> if the card issuer also discloses how long the fees or waivers will
> remain in effect.

general matter, credit card issuers are required to disclose fees whose imposition will be delayed for a given period of time, such as the annual fee at issue here.

Fleet is apparently of the view that the card issuer's obligation, under this provision, to disclose the temporary nature of the fee in advance arises only when the cardholder agreement, which is ordinarily provided later, will include mention of the fee. Such a rule, however, would permit issuers to readily circumvent the requirement. The common practice of offering cards with low "teaser" rates would effectively be rendered immune from disclosure requirements. From the point of view of the consumer, there is no substantive difference between a card that had a low "fixed" rate that the issuer secretly intends to increase six months later, and a card with a low temporary rate that will similarly increase after half a year. The only purported basis for the difference in disclosure requirements is language in a document that, in most cases, the consumer will not have been provided at the time of the disclosures. Solicitation disclosures are intended to alert the consumer to the basic costs of the credit card he is considering--a purpose unserved where the issuer conceals the temporary nature of a favorable fee or rate in this manner.

Because so many credit solicitations do include introductory rates and fees, it is reasonable to view a solicitation that promises fixed rates and no annual fees as describing an agreement under which the issuer intends to offer those terms until there is a reason to change them. A statement, therefore, that a card has "no annual fee" made by a creditor that intends to impose such a fee shortly thereafter, is misleading. It is an accurate statement only in the narrowest of senses--and not in a sense appropriate to consumer protection disclosure statute such as the TILA. Fleet's proposed approach would permit the use of required disclosures--intended to protect consumers from hidden costs--to intentionally deceive customers as to the costs of credit. Neither the language of the TILA itself, nor Regulation Z or the Official Staff Interpretations directs such a result.

23

Rossman has alleged Fleet intentionally and in fact misled her and others with its disclosure of a "no-annual-fee" credit card. If Rossman's allegations are true--which we assume on a motion to dismiss--such misleading statements are inaccurate for purposes of the TILA, and violate its requirements.

Conclusion

For the forgoing reasons, we hold that Rossman has stated a claim under the TILA. Accordingly, we will reverse the judgment of the District Court, and remand for proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

24