**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TIMOTHY HAUK, on behalf of
himself and all others similarly
situated,

*Plaintiff-Appellant,*

v.

JP MORGAN CHASE BANK USA,

*Defendant-Appellee.*

No. 06-56846

D.C. No.
CV-05-00625-SVW

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
October 22, 2008—Pasadena, California

Filed January 23, 2009

Before: Consuelo M. Callahan and Sandra S. Ikuta,
Circuit Judges, and William B. Shubb,*

Opinion by Judge Shubb

---

*The Honorable William B. Shubb, Senior United States District Judge
for the Eastern District of California, sitting by designation.

**COUNSEL**

Michael D. Braun, Braun Law Group, P.C., Los Angeles, California; Matthew J. Zevin, Stanley, Mandel & Iola, L.L.P., San Diego, California, for the plaintiff-appellant.

Shirley M. Hufstedler, Robert S. Stern, and Nancy R. Thomas, Morrison & Foerster L.L.P., Los Angeles, California; Angela L. Padilla and Geoffrey Graber, Morrison & Foerster L.L.P., San Francisco, California, for the defendant-appellee.

**OPINION**

SHUBB, Senior District Judge:

Appellant Timothy Hauk appeals the district court's grant of summary judgment in favor of Appellee Chase Bank USA, N.A.[1] on his claims for violations of the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667f; California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200-17210; and California's False Advertising Law (FAL), *id.* §§ 17500-17509. We affirm the district court's grant of summary judgment on Hauk's TILA claim but reverse and remand the district court's grant of summary judgment on his UCL and FAL claims.

**I.   Factual and Procedural Background**

In June 2003, Hauk opened a Chase credit card account and received a Cardmember Agreement ("CMA"). After Hauk had maintained his Chase account for about sixteen months, Chase sent him a balance transfer offer (BTO) in October 2004. The BTO offered Hauk a promotional fixed annual percentage rate (APR) of 4.99% for any balances he transferred to his Chase account. It also incorporated the terms of the CMA and indicated that Chase could impose an increased rate ("Non-Preferred APR") in lieu of the promotional rate if Hauk made a late payment to Chase or any of his other creditors. During a telephone conversation with a Chase representative on or about October 11, 2004, Hauk transferred a $10,200 balance with another creditor to his Chase account, thereby accepting the BTO.

On Hauk's October statement, Chase indicated the promotional APR of 4.99% for transferred balances. When Hauk received his November statement, however, he learned that

---

[1]Chase contends it was erroneously sued as JP Morgan Chase Bank USA.

Chase had applied a Non-Preferred APR of 28.74% to his account, resulting in a $241.60 finance charge. In response to the increased rate, Hauk contacted Chase and was informed that he was no longer eligible to receive the promotional 4.99% APR.

According to Chase, Hauk lost eligibility for the 4.99% APR because of a late payment he had made to another creditor about three months before he accepted the BTO. Specifically, in July 2004, Hauk had made his final mortgage payment to Home Coming Funding (HCF) one day after the thirty-day grace period, and HCF reported that Hauk's account was "30-days delinquent" to Experian, Inc., a credit report agency.

To evaluate Hauk's eligibility for promotional and Preferred rates, Chase performed monthly account reviews and relied on information it received from Experian. Prior to sending Hauk the October BTO, Chase had accessed his Experian credit report in August and September 2004. If Chase had discovered Hauk's late payment to HCF during either of those credit reviews and elected to impose a Non-Preferred APR because of that late payment, Chase's computer system would have automatically cancelled any pending offers, including the BTO. Chase, however, did not cancel the BTO before Hauk accepted it, and Hauk's account does not reflect Chase's knowledge of his late payment to HCF until the end of October.

Based on this information, Chase contends that it did not discover Hauk's late payment to HCF until after Hauk accepted the BTO. Hauk, on the other hand, alleges that Chase discovered his late payment to HCF in August or September but waited to apply a Non-Preferred APR until after he accepted the BTO. Hauk also argues that, irrespective of when Chase learned about Hauk's late payment to HCF, the CMA and BTO did not disclose that Chase could impose a

Non-Preferred APR based on a late payment he made before accepting the BTO.

Hauk filed his class action Complaint in state court on March 25, 2005. In his First Amended Complaint filed less than three months later, Hauk alleged claims for violations of 1) TILA; 2) UCL; 3) FAL; 4) California's Consumers Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1750-1784; and 5) the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681-1681x. Asserting jurisdiction under 28 U.S.C. § 1331, Chase removed the matter to the United States District Court for the Central District of California on July 11, 2005.

Chase moved for summary judgment on the grounds that Hauk's state law claims were preempted and that Chase's disclosures defeated Hauk's TILA and state law claims. After providing for limited discovery, the district court granted Chase's motion for summary judgment on Hauk's TILA claim. With respect to Hauk's UCL, FAL, and CLRA claims, the district court found that the state law claims were not preempted and deferred addressing the merits until the parties conducted discovery on the question of when Chase first learned of Hauk's late payment to HCF. After additional discovery and supplemental briefing, the district court granted Chase's motion for summary judgment on Hauk's state law claims, explaining that Chase's disclosures defeated the claims and that Hauk could not prove Chase had knowledge of his late payment before he accepted the BTO. Hauk has withdrawn his FCRA claim and does not appeal the district court's grant of summary judgment on his CLRA claim. Hauk therefore appeals only the district court's grant of summary judgment in favor of Chase on his TILA, UCL, and FAL claims.

## II. Discussion

We review a district court's grant of summary judgment de novo, thereby applying the same standard as a district court.

*Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When determining whether a genuine issue of material fact remains for trial, we must view the evidence and all inferences therefrom in the light most favorable to the non-moving party and may not weigh the evidence or make credibility determinations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We also review a district court's interpretation of state law de novo. *Laws*, 448 F.3d at 1137.

### A.  Hauk's TILA Claim

[1] Congress enacted TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601. To effectuate TILA's purpose, a court must construe "the Act's provisions liberally in favor of the consumer" and require absolute compliance by creditors. *In re Ferrell*, 539 F.3d 1186, 1189 (9th Cir. 2008); *see also Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir. 1989) ("Even technical or minor violations of the TILA impose liability on the creditor.").

TILA entrusts the Federal Reserve Board with implementation of the Act, and the agency has imposed "even more precise" disclosure requirements via Regulation Z. *Virachack v. Univ. Ford*, 410 F.3d 579, 581 (9th Cir. 2005); *see also Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 238 (2004) ("Congress has expressly delegated to the Board the authority to prescribe regulations containing 'such classifications, differentiations, or other provisions' as, in the judgment of the Board, 'are necessary or proper to effectuate the pur-

poses of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith.' " (quoting 15 U.S.C. § 1604(a))) (alteration in original). Courts must defer to the decisions of the Federal Reserve Board and cannot apply "[t]he concept of 'meaningful disclosure' that animates TILA . . . in the abstract." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980); *see also Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981) ("[A]bsent some obvious repugnance to the statute, . . . [Regulation Z] should be accepted by the courts, as should the Board's interpretation of its own regulation.").

**[2]** Hauk's account with Chase provided him with the use of open-ended credit, rendering the disclosures in Subpart B of Regulation Z controlling. *See* 12 C.F.R. § 226.2(a)(20).[2] Because the BTO constituted a "credit device," subdivision 226.9(b)(2) mandated the applicable disclosures in subsection 226.6(a). *See* Official Staff Comm., 12 C.F.R. § 226, Supp. I, § 226.9(b) cmt. 1. Specifically, subsection 226.6(a) required that the BTO disclose the applicable APR and any increased penalty rate that may apply "upon the occurrence of one or more specific events, such as a late payment." *Id.* § 226.6(a)(2) cmt. 11.

Regulation Z also required that Chase's disclosures "reflect the terms of the legal obligation between the parties." 12 C.F.R. § 226.5(c). Pursuant to subsection 226.5(c), a disclosure would have violated TILA if it inaccurately described the creditor's or cardholder's rights or obligations as they existed at the time the disclosure was made. *DeMando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000); *see also* Official Staff

---

[2]Hauk also bases his TILA claim on sections 226.17 and 226.18 of Regulation Z, which are in Subpart C and apply only to closed-end credit transactions. *See id.* § 226.2(a)(10) (defining closed-end credit to exclude open-ended credit). Hauk's reliance on section 226.5a is also misguided because that section applies only to "a solicitation or an application to open a credit or charge card account." *Id.* § 226.5a(a).

Comm., 12 C.F.R. § 226, Supp. I, § 226.5(c) cmt. 1 ("The dis-closures should reflect the credit terms to which the parties are legally bound at the time of giving the disclosures. The legal obligation is determined by applicable state or other law . . . [and] normally is presumed to be contained in the contract that evidences the agreement.").

**[3]** Here, while the BTO stated that Chase had sent Hauk "balance transfer checks with a low 4.99% Fixed APR," it disclosed that Hauk may lose that rate upon the occurrence of certain events. Specifically, a footnote on the first page of the BTO stated, "This special rate applies only when you make your required minimum payments by the payment due date . . . and your Account is eligible for Preferred Customer Pric-ing as described in the Terms of Offer." On the reverse side of the BTO, the Terms of Offer indicated that Hauk's accep-tance of the offer "will" result in the 4.99% APR until his bal-ance is paid in full but expressly limited Hauk's continued eligibility for that rate:

> Any promotional rate or regular Preferred Pricing purchase APR may change to your Non-Preferred APR if any minimum payment on any loan or account of yours with us or your other creditors was not made by the payment due date . . . .

The CMA also disclosed that, as a condition to remaining eli-gible for Preferred rates, Hauk must "have made at least the required minimum payments when due" on his account and loans with Chase and his other creditors. By referencing any late payments in the past tense ("was not made" and "have made"), the BTO and CMA sufficiently disclosed that Hauk could lose the promotional 4.99% APR if he *had* made a late payment to any of his creditors.

As both parties recognize, the CMA and BTO did not give Chase an unlimited right to impose a Non-Preferred APR based on any past late payment. If Chase had learned of a late

payment in a particular month and elected not to increase the cardholder's APR because of it, Chase arguably would have waived its right to increase the cardholder's APR in a subsequent month based on that same late payment.[3] *See Klein v. Am. Luggage Works, Inc.*, 158 A.2d 814, 818 (Del. 1960) ("Waiver is the voluntary relinquishment of a known right or conduct such as to warrant an inference to that effect. It implies knowledge of all material facts and of one's rights, together with a willingness to refrain from enforcing those rights."); *accord AeroGlobal Capital Mgmt., L.L.C. v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005).

Chase could not, however, be deemed to have waived its right to impose a Non-Preferred APR based on a late payment it discovered after it mailed the BTO, even if that late payment occurred before it mailed the BTO. *See Klein*, 158 A.2d at 818 ("It is obvious that one cannot waive that of which he had no knowledge at the time of the alleged waiver."); *see also AeroGlobal Capital Mgmt., L.L.C.*, 871 A.2d at 444 ("[T]he standards for proving waiver under Delaware law are 'quite exacting.' . . . The facts relied upon to prove waiver must be unequivocal.") (citations omitted).

**[4]** Nonetheless, while Chase may have breached the CMA if it knew of Hauk's late payment before he accepted the BTO, the injury Hauk suffered neither resulted from any lack of TILA disclosures nor gave rise to a claim under TILA. Unlike Hauk's state law claims, TILA is only a "disclosure statute" and "does not substantively regulate consumer credit

---

[3]The CMA is governed by Delaware law and contemplates Chase's waiver of its rights:

> [W]e may waive our rights, such as our right to enforce a Non-Preferred rate on existing and new balances until paid in full or to enforce any minimum Non-Preferred rate. However, if we do waive any of our rights and there is another occurrence when you do not meet the conditions described above to be eligible for Preferred rates, we may again impose a Non-Preferred rate up to the Maximum Non-Preferred rate . . . .

but rather 'requires disclosure of certain terms and conditions of credit before consummation of a consumer credit transaction.' " *Rendler v. Corus Bank*, 272 F.3d 992, 996 (7th Cir. 2001) (citation omitted); *see also Grimes v. New Century Mortgage Corp.*, 340 F.3d 1007, 1011 (9th Cir. 2003) (McKeown, J., dissenting) ("The [plaintiffs] may indeed have been duped by an unethical loan officer. Whether they have a claim under [TILA] . . . is another matter. TILA focuses on disclosure and does not serve as an umbrella statute for consumer protection in real estate transactions. Rather, TILA is designed to foster the informed use of credit by 'assur[ing] a meaningful disclosure of credit terms.' " (quoting 15 U.S.C. § 1601(a))) (third alteration in original); *Szumny v. Am. Gen. Fin.*, 246 F.3d 1065, 1070 (7th Cir. 2001) (" 'A creditor's substantive rights are still governed by state law; [TILA] merely classifies those rights for disclosure purposes.' ").

The legislative history from Congress's enactment and amendment of TILA is consistent with the language of the statute limiting its scope to disclosure. *See* S. Rep. No. 392, at 1 (1967) ("The basic purpose of the truth in lending bill is to provide a full disclosure of credit charges to the American consumer. The bill does not in any way regulate the credit industry . . . ."); H.R. Rep. No. 1040 (1967), *as reprinted in* 1968 U.S.C.C.A.N. 1962, 1963 ("Title I, the truth in lending and credit advertising title, [does not] regulate[ ] the credit industry . . . . It provides for full disclosure of credit charges, rather than regulation of the terms and conditions under which credit may be extended."); S. Rep. 100-259, at 3 (1987), *as reprinted in* 1987 U.S.C.C.A.N. 3936, 3938 ("The Committee believes that early disclosure of relevant cost information, coupled with widespread publication of the costs of different cards, will help remedy the problem of enabling consumers to shop around for the best cards.").

**[5]** Consequently, while an inaccurate disclosure that itself breaches a credit agreement may also violate TILA, *see Hubbard v. Fidelity Fed. Bank*, 91 F.3d 75, 79 (9th Cir. 1996), the

breach of a credit agreement based on conduct independent of the disclosures does not necessarily give rise to a TILA claim.

Hauk nonetheless argues that misleading disclosures can violate TILA and that Chase's disclosures were misleading because the BTO offered him a promotional rate even though Chase knew of his past late payment and intended to impose the Non-Preferred APR after he accepted the offer. Indeed, the Third Circuit has held that a disclosure that is adequate when viewed in isolation could still be misleading, and thereby give rise to a TILA claim, if the creditor's undisclosed intent was inconsistent with its disclosure. *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 399-400 (3d Cir. 2002); *accord Clark v. Troy & Nichols, Inc.*, 864 F.2d 1261, 1266 (5th Cir. 1989) (Thornberry, J., dissenting). Specifically, the court concluded that, even though the creditor's initial "no annual fee" disclosure was accurate in the "narrowest of senses," the creditor's alleged intent to impose an annual fee six months later rendered the initial disclosure misleading and gave rise to a TILA claim. *Rossman*, 280 F.3d at 400.

The Third Circuit's expansive reading of Regulation Z appears to have originated with its general premise that TILA prohibits "not only literal falsities, but also misleading statements." *Id.* at 391 (citing *Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689, 692 (7th Cir. 1998); *Smith v. Chapman*, 614 F.2d 968, 977 (5th Cir. 1980)). While a misleading statement may violate TILA, *Wilson v. Credithrift of Am., Inc., No. 3*, 659 F.2d 122, 124 (9th Cir. 1981), our circuit has neither rejected nor adopted the blanket proposition that a misleading statement violates TILA. Instead of determining whether a particular disclosure is "misleading" in the abstract, our circuit has focused on subsection 226.5(c)'s requirement that disclosures "reflect the terms of the legal obligation between the parties" and the requirements in other relevant subsections of Regulation Z or TILA.

The Third Circuit, in contrast, did not rely on a particular provision of TILA or Regulation Z to support its conclusion

that a disclosure could violate TILA based on a creditor's undisclosed intent to act contrary to the disclosure. In holding that a lender's intent may render a disclosure misleading, the court focused on the difficulty a cardholder would face upon receipt of a change-in-terms notice imposing a new annual fee if the cardholder had already accumulated a high balance and could not pay off the balance to avoid the fee. *Rossman*, 280 F.3d at 397-99. Congress, however, has already vested responsibility for determining whether Regulation Z should require additional disclosures to protect against such hardships exclusively with the Federal Reserve Board:

> The concept of "meaningful disclosure" that animates TILA, cannot be applied in the abstract. *Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between "competing considerations of complete disclosure . . . and the need to avoid . . . [informational overload.]" And striking the appropriate balance is an empirical process that entails investigation into consumer psychology and that presupposes broad experience with credit practices. Administrative agencies are simply better suited than courts to engage in such a process.

*Ford Motor Credit Co.*, 444 U.S. at 568-69 (citations omitted) (alteration and omissions in original); *accord Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 243-44 (2004).

**[6]** As the Supreme Court has emphasized, when neither Congress nor the Federal Reserve Board has elected to require a particular disclosure, such as a disclosure about a creditor's intent, a court should not impose that disclosure requirement:

> [L]egislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing

upon the regulatory scheme. Accordingly, caution must temper judicial creativity in the face of legislative or regulatory silence.

*Ford Motor Credit Co.*, 444 U.S. at 565; *see also id.* at 562 (declining to "stretch [ ] provisions [of Regulation Z] beyond their obvious limits to construe them as a mandate for [a particular] disclosure"). Similar to the creditor's undisclosed intent in *Rossman*, TILA did not require Chase to disclose its supposed intent to take an action at odds with the CMA. *See Clark*, 864 F.2d at 1264 ("[TILA] does not provide a cause of action when a lender engages in 'bait and switch' techniques. . . . The disclosures made by [defendant] were accurate with respect to the offered terms. The fact that [defendant] may not have intended to loan money under the stated terms does not make their disclosures with respect to the stated terms inaccurate.").

**[7]** We hold that a creditor's undisclosed intent to act inconsistent with its disclosures is irrelevant in determining the sufficiency of those disclosures under sections 226.5, 226.6, and 226.9 of Regulation Z. Accordingly, because Chase's disclosures complied with TILA and Regulation Z, the district court properly granted summary judgment against Hauk on his TILA claim.

### B. *Hauk's UCL and FAL State Law Claims*

**[8]** California's UCL has a broad scope that allows for "violations of other laws to be treated as unfair competition that is independently actionable" while also "sweep[ing] within its scope acts and practices not specifically proscribed by any other law." *Kasky v. Nike, Inc.*, 45 P.3d 243, 249 (Cal. 2002). It "defines 'unfair competition' to mean and include 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" the FAL. *Id.* (quoting Cal. Bus. & Prof. Code § 17200). As relevant to this case, the FAL renders it unlaw-

ful for a defendant to "induce the public to enter into any obligation" based on a statement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.[4]

**[9]** The California Supreme Court has explained, however, that conduct affirmatively authorized by another statute may provide a defendant with a safe harbor from UCL liability: "Although the unfair competition law's scope is sweeping, it is not unlimited. . . . When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." *Cal-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 541 (Cal. 1999).[5] The safe harbor "rule does not, however, prohibit an action under the unfair competition law merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct." *Id.*

**[10]** Chase's compliance with TILA's disclosure requirements provides a safe harbor with respect to Hauk's UCL claims based only on the sufficiency of Chase's disclosures. *See Rubio v. Capital One Bank (USA), N.A.*, 572 F. Supp. 2d 1157, 1168 (C.D. Cal. 2008) (finding that a disclosure that complies with TILA comes within the UCL's safe harbor).

---

[4]On appeal, Chase argues for the first time that Hauk lacks statutory standing under section 17240 of the UCL and section 17535 of the FAL. "Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so." *In re Am. W. Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000) (citations omitted). There are no exceptional circumstances to warrant consideration of this argument.

[5]Plaintiff incorrectly contends that Chase did not assert the safe harbor rule below. Although the district court did not discuss the safe harbor rule in its orders, Chase raised the argument in its memorandum in support of its motion for summary judgment.

TILA did not, however, authorize Chase to subsequently take an action at odds with the disclosures it made (i.e., impose a Non-Preferred APR based on a right it had already waived). Similarly, Chase cannot rely on the UCL's safe harbor if it should have known about Hauk's late payment before he accepted the BTO because TILA did not clearly permit disclosures based on inadequate information. *Cf.* 12 C.F.R. § 226.5(c) ("If any information necessary for accurate disclosure is unknown to the creditor, it shall make the disclosure based on the best information reasonably available and shall state clearly that the disclosure is an estimate."). Therefore, if Chase knew or should have known about Hauk's late payment to HCF before Hauk accepted the BTO, Chase cannot rely on TILA to bring its conduct within the UCL's safe harbor.[6]

[11] The evidence Hauk submitted establishes a genuine issue of material fact with respect to whether Chase knew or should have known about Hauk's late payment to HCF before Hauk accepted the BTO. Neither party was able to produce direct evidence from Chase's or Experian's computer systems that unequivocally establishes when Experian first noted Hauk's late payment to HCF on his credit report. Hauk nonetheless produced sufficient circumstantial evidence to support the inference that Chase knew or should have known of his late payment before he accepted the BTO.

First, Experian's employee repeatedly testified that HCF reported Hauk's late payment to Experian in August 2004.[7]

---

[6] Chase's knowledge for purposes of Hauk's UCL and FAL claims must be assessed up until the date Hauk accepted the BTO because, according to Chase, its decision to apply a Non-Preferred APR at any point before that date would have automatically cancelled any pending offers, including the BTO.

[7] During her deposition, the Experian employee confirmed at least eight times that Experian received notice of Hauk's late payment to HCF in August. After a break, she appears to limit her testimony to explain that the credit reports reveal only the month in which HCF indicated it submitted the information to Experian (not necessarily the month Experian received the information from HCF). The employee's testimony after the break neither negates her prior testimony nor renders that testimony inherently untrustworthy.

Second, Hauk submitted a copy of his Experian credit report from March 2005, which included entries that two creditors had reported to Experian in that same month, suggesting that Experian immediately reported any information it received. Finally, it is undisputed that Chase reviewed Hauk's credit report on August 16 and September 19, 2004. Taken together, this evidence supports the inference that Experian received notice of Hauk's late payment to HCF in August and indicated it on his credit report that month, and thus Chase either discovered or should have discovered his late payment when it reviewed his credit report in August or September.

Hauk also established that Chase's computer system automatically creates a memo of a late payment only in the event that Chase elects to apply a Non-Preferred APR. Consequently, if Chase decided that a late payment "was not a material change in the credit profile" justifying imposition of a Non-Preferred APR, Hauk's account would not reflect this decision. The lack of notation in Hauk's file about his late payment until the end of October thereby gives rise to two possible inferences: 1) that Chase did not discover the late payment until noting it in his file in October; or 2) that Chase discovered the late payment in a prior month, but decided not to impose a Non-Preferred APR and thereby waived its right to do so. On a motion for summary judgment, this court cannot weigh the merit of these inferences, but must adopt the inference that is most favorable to the non-moving party—in this case, the latter inference. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whe[n] he is ruling on a motion for summary judgment . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (citation omitted).

Taking all inferences in favor of Hauk, a reasonable jury could find that Chase knew or should have known about

Hauk's late payment to HCF before he accepted the BTO. *See id.* at 248 ("[A dispute is genuine] if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). As Chase concedes, this factual dispute is material to Hauk's UCL and FAL claims and enables Hauk to withstand summary judgment on those claims. *See id.* (a fact is material if it "might affect the outcome of the suit under the governing law").

Specifically, if Chase knew or should have known about Hauk's late payment, but waited to apply a Non-Preferred APR until after he accepted the BTO, Chase's conduct may give rise to a UCL claim. *See State Farm Fire & Casualty Co. v. Superior Court*, 53 Cal. Rptr. 2d 229, 235 (Cal. Dist. Ct. App. 1996) ("asserting a contractual right one does not have" may constitute an unfair business practice), *abrogated on other grounds by Cal-Tech Commc'ns, Inc.*, 973 P.2d at 564. The conduct may also give rise to fraudulent UCL and FAL claims because a cardholder receiving the BTO could likely be deceived into believing that Chase would not later apply a Non-Preferred APR based on a late payment it had waived. *See id.* at 235 ("[T]he 'fraud' contemplated by section 17200's third prong bears little resemblance to common law fraud or deception. The test is whether the public is likely to be deceived.") (citations omitted); *People v. Dollar Rent-A-Car Sys., Inc.*, 259 Cal. Rptr. 191, 197 (Cal. Dist. Ct. App. 1989) ("In order to recover under [the FAL], it is necessary to show only that members of the public are likely to be deceived."); *see also Lavie v. Procter & Gamble Co.*, 129 Cal. Rptr. 2d 486, 492-93 (Cal. Dist. Ct. App. 2003) (applying the "reasonable consumer" standard).

**[12]** Accordingly, because a genuine issue of material fact remains with respect to Hauk's state law UCL and FAL claims, we reverse the district court's grant of summary judgment in favor of Chase on those claims. For the reasons stated above, however, we affirm the district court's grant of summary judgment in favor of Chase on Hauk's TILA claim. As

a federal claim no longer gives rise to subject matter jurisdiction, we recognize that the district court may decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Each party shall bear its own costs.