**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHERYL BARRER; WALTER BARRER,
on behalf of themselves and those
similarly situated,
          *Plaintiffs-Appellants,*

          v.

CHASE BANK USA, N.A.,
          *Defendant-Appellee.*

No. 07-35414

D.C. No.
CV-06-00415-
HA/HU

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
December 11, 2008—Portland, Oregon

Filed May 19, 2009

Before: Diarmuid F. O'Scannlain, Susan P. Graber, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Graber

**COUNSEL**

Michael D. Braun, Braun Law Group, P.C., Los Angeles, California, argued the cause for the appellants and filed the briefs. Matthew J. Zevin, Stanley, Mandel & Iola, LLP, San Diego, California, was also on the briefs.

Nancy R. Thomas, Morrison & Foerster LLP, Los Angeles, California, argued the cause for the appellee and was on the brief. Robert S. Stern, Morrison & Foerster LLP, Los Angeles, California, filed the brief. Shirley M. Hufstedler, Morrison & Foerster LLP, Los Angeles, California, and Angela L. Padilla and Geoffrey Graber, Morrison & Foerster LLP, San Francisco, California, were also on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a credit card company violates the Truth in Lending Act when it fails to disclose potential risk factors that allow it to raise a cardholder's Annual Percentage Rate.

I

A

Walter and Cheryl Barrer held a credit card account with Chase.[1] The Barrers received and accepted the Cardmember

---

[1] According to Chase, the account was in Walter Barrer's name only; Cheryl Barrer was an "Authorized User," and therefore not legally responsible for the account. For simplicity's sake, we refer to the couple collectively as "the Barrers."

Agreement ("the Agreement") governing their relationship at the relevant time in late 2004. In February 2005, Chase mailed to the Barrers a Change in Terms Notice ("the Notice"), which purported to amend the terms of the Agreement, in particular to increase the Annual Percentage Rate ("APR") significantly. It also allowed the Barrers to reject the amendments in writing by a certain date. They did not do so, and continued to use the credit card. Within two months, the new, higher, APR became effective.

According to the Barrers' First Amended Complaint (which is the operative complaint), they enjoyed a preferred APR of 8.99% under the Agreement. In a section entitled "Finance Charges," the Agreement provided a mathematical formula for calculating preferred and non-preferred APRs and variable rates. In the event of default, the Agreement stated that Chase might increase the APR on the balance up to a stated default rate. The Agreement specified the following events of default: failure to pay at least a minimum payment by the due date; a credit card balance in excess of the credit limit on the account; failure to pay another creditor when required; the return, unpaid, of a payment to Chase by the customer's bank; or, should Chase close the account, the consumer's failure to pay the outstanding balance at the time Chase has appointed.

Another section entirely, entitled "Changes to the Agreement," provided that Chase "can change this agreement at any time, . . . by adding, deleting, or modifying any provision. [The] right to add, delete, or modify provisions includes financial terms, such as APRs and fees." The next section, entitled "Credit Information," stated that Chase "may periodically review your credit history by obtaining information from credit bureaus and others." These sections appeared five and six pages, respectively, after the "Finance Charge" section.

Around April 2005, the Barrers' noticed that their APR had "skyrocketed" from 8.99% to 24.24%, the latter a rate close to a non-preferred or default rate. None of the events of

default specified in the Agreement, however, had occurred. When the Barrers contacted Chase to find out why their APR had increased, Chase responded in a letter citing judgments it had made on the basis of information obtained from a consumer credit reporting agency. In particular, Chase wrote that: "outstanding credit loan(s) on revolving accounts . . . [were] too high" and there were "too many recently opened installment/revolving accounts." The Barrers do not dispute the facts underlying Chase's judgments.

Despite the Barrers' surprise, the Notice they had received in February contained some indication of what would be forthcoming. Specifically, it disclosed that Chase would shortly increase the APR to 24.24%, a decision "based in whole or in part on the information obtained in a report from the consumer reporting agency."

The Barrers paid the interest on the credit account at the new rate for three months before they were able to pay off the balance. Then they sued Chase in federal district court.

B

The Barrers filed a class action lawsuit on their own behalf and on behalf of all Chase credit card customers similarly harmed and similarly situated. The complaint asserted one cause of action under the Truth in Lending Act ("the Act"), 15 U.S.C. §§ 1601 et seq., and Regulation Z, 12 C.F.R. § 226, promulgated thereunder. The Barrers claim to have been the victims of a practice they now call "adverse action re-pricing," which apparently means "raising . . . a preferred rate to an essentially non-preferred rate based upon information in a customer's credit report." Though the Barrers do not claim that the practice itself is illegal, they do claim that it was illegal for Chase not to disclose it fully to them or to the other members of the putative class.

Chase moved to dismiss the Barrers' cause of action for failure to state a claim under the Act, or alternatively to compel arbitration in accordance with the terms of the Agreement's arbitration provision. The magistrate judge recommended in favor of Chase on both motions. Because the district court agreed that the Barrers' cause of action should be dismissed, and their case with it, it never reached the magistrate judge's recommendation regarding Chase's motion to compel arbitration, but simply entered judgment for Chase.[2] The Barrers timely appeal.

II

**[1]** The Truth in Lending Act is designed "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). Rather than substantively regulate the terms creditors can offer or include in their financial products, the Act primarily requires disclosure. *See Hauk v. J.P. Morgan Chase Bank USA*, 552 F.3d 1114, 1120 (9th Cir. 2009). The Barrers' credit card is considered to be an "open end credit plan,"[3] one of the products the Act regulates. Under the typical commercial arrangement, credit card holders pay a fee, called a finance charge, in order to draw on their credit account. The interest rate or rates used to compute the finance charge generate an APR, a number which is a typical, and therefore useful, comparative measure of the price of the

---

[2]In their briefs, the Barrers challenged the magistrate judge's conclusion regarding Chase's motion to compel arbitration out of an abundance of caution. Their counsel conceded at oral argument that the challenge was not ripe.

[3]The Act defines an "open end credit plan" as "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602(i).

credit the company sells to the consumer. *See* 15 U.S.C. §§ 1605(a) & 1606(a)(2).

**[2]** In general, the Act regulates credit card disclosures at numerous points in the commercial arrangement between creditor and consumer: at the point of solicitation and application, at the point the consumer and the creditor consummate the deal, at each billing cycle, and at the point the parties renew their arrangement. *Id.* § 1637(a)-(d). Specifically, creditors must disclose "[t]he conditions under which a finance charge may be imposed," "[t]he method of determining the amount of the finance charge," and, "[w]here one or more periodic rates may be used to compute the finance charge, each such rate . . . and the corresponding nominal annual percentage rate." *Id.* § 1637(a)(1), (a)(3) & (a)(4). Subsection 1604(a) directs the Board of Governors of the Federal Reserve System ("the Board") to "prescribe regulations to carry out the purposes of" the Act.

**[3]** Regulation Z, 12 C.F.R. § 226, provides the precise regulations that the Barrers claim Chase violated. In general, these regulations establish two conditions a creditor must meet. "First, it must have disclosed all of the information required by the statute." *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 391 (3d Cir. 2002). That is, disclosures must be complete. "And second, [they] must have been true— i.e., . . . accurate representation[s] of the legal obligations of the parties at [the] time [the agreement was made]." *Id.*

**[4]** Section 226.6 lists the initial disclosures required of a creditor under a new credit agreement. The list includes "each periodic rate that may be used to compute the finance charge . . . and the corresponding annual percentage rate." 12 C.F.R. § 226.6(a)(2). The Board has interpreted this regulation in a staff commentary,[4] comment 11, which provides that "[i]f the

---

[4]"Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive . . . ." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980).

initial rate may increase upon the occurrence of one or more specific events, . . . the creditor must disclose the initial rate and the increased penalty rate that may apply" and "an explanation of the specific event or events that may result in the increased rate." 12 C.F.R. Pt. 226 Supp. I, par. 6(a)(2), cmt. 11. Even if the rate itself is indeterminate at the time of the initial disclosure, the creditor must still disclose the specific event or events leading to a rate increase. *Id.* As examples of a specific event, the comment lists "a late payment or an extension of credit that exceeds the credit limit." *Id.*

[5] Just as section 226.6 states what must be disclosed, so section 226.5 describes how to disclose it. Among other things, creditors must make the required disclosures "clearly and conspicuously in writing." 12 C.F.R. § 226.5(a)(1).[5] And, again, any disclosures must "reflect the terms of the legal obligation between the parties." *Id.* § 226.5(c).

Creditors are not required to be clairvoyant, however, for "[i]f a disclosure becomes inaccurate because of an event that occurs after the creditor mails or delivers the disclosures, the resulting inaccuracy is not a violation of [Regulation Z]." *Id.* § 226.5(e). The Board has also recognized that creditors may reserve the general right to change the credit agreement, as Chase did in this case. *See* 12 C.F.R. Pt. 226 Supp. I, par. 6(a)(2), cmt. 2 (recognizing the use of general reservation clause). Should the creditor make changes in these ways, it may have to disclose anew under § 226.9(c). *Id.*

Finally, although the text of the Act and regulations governs, we construe that text in favor of the cardholder by

---

[5]Subsection 226.5(a)(2) also requires that the finance charge and APR, "when required to be disclosed with a corresponding amount or percentage rate, shall be more conspicuous than any other required disclosure." This provision does not apply here, however, because we do not address the required disclosure of a specific APR. We therefore express no opinion on it, beyond clarifying its non-application to this case.

strictly enforcing its regulation against the creditor. *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir. 1989).

### III

The Barrers argue that Chase consciously shielded its "adverse action repricing" program from its customers, deceiving them as to why their APRs might increase. To phrase it in the language of the Act, they allege that Chase failed to disclose completely under the Act why it would change the APRs of its cardholders, in violation of subsection 226.6(a)(2) of Regulation Z.[6]

The Barrers do not argue that either the Agreement or the Notice failed to disclose the APR, which their complaint puts at 8.99% under the Agreement and 24.24% under the Notice. Rather, they argue that Chase violated the Act by failing to disclose "(1) the existence of the [adverse action re-pricing] practice; (2) the credit factors that trigger an adverse action re-price of a customer's preferred APR; and (3) that information obtained from a consumer's credit report will be used for this purpose." Thus, the gravamen of the Barrers' complaint is that Chase did not disclose that if a cardholder's credit report revealed certain information, what Chase calls "risk factors," the APR might go up.

### A

**[6]** Subsection 226.6(a)(2) states that "[t]he creditor shall disclose to the [cardholder] . . . each periodic rate that may be

---

[6]The complaint also claimed, in the alternative, that "to the extent Chase has issued subsequent disclosures that purported to increase Plaintiffs' and the Class' APR based on factors, events, or circumstances not reflected in the original [Agreement], . . . such disclosures violate [the Act] and Regulation Z in that they fail to accurately reflect the legal obligations of the parties." We do not reach this theory of liability, premised on allegedly inaccurate disclosure in the Notice in violation of § 226.5(c), because we find the Barrers' first theory sufficiently states a claim.

used to compute the finance charge . . . and the corresponding annual percentage rate." There is, again, no dispute that Chase disclosed the new APR after it had calculated it and before it went into effect. Comment 11, however, indicates that more is required. Most importantly, even if the creditor could not know what a potential increased rate would be when it made the original disclosures, "the creditor must provide an explanation of the specific event or events that may result in the increased rate." 12 C.F.R. Pt. 226 Supp. I, par. 6(a)(2) cmt. 11. According to the Barrers, the risk factors that Chase considered under its adverse action repricing program are "specific events that may result in the increased rate," and Chase had to disclose them.

Chase counters that the risk factors are too general to fall under the meaning of "specific events." It points to the examples of events comment 11 provides: late payments and credit draws in excess of the credit limit. By contrast, Chase claims, the reasons the complaint alleges Chase raised APRs are more like judgment calls, assessments of a cardholder's risk as the credit history unfolds: outstanding credit loans on revolving accounts that were "too high"; "too many recently opened installment/revolving accounts"; debts on loan finance trades that were "too high"; or an average time accounts had been opened that was "too short." Chase contends that it needs flexibility to adjust the terms on which it offers credit according to such risk factors, but that it cannot possibly disclose every factor it might consider because the list is potentially infinite and constantly changes as market conditions change.

We recognize that, as we noted above, neither the Act nor Regulation Z demands clairvoyance from creditors. The comments specifically contemplate general reservation clauses, and Regulation Z recognizes that subsequent events, specific or not, can render inaccurate a creditor's initial disclosures and require new ones. *See* 12 C.F.R. Pt. 226 Supp. I, par. 9(c), cmt. 1; 12 C.F.R. § 226.5(e). But this does not dispose of the issue. At its core, the Barrers' complaint alleges not that

Chase adjusted APRs based on unknown future events that forced it to reprice the credit it offered. Rather, the Barrers specifically accuse Chase of having a pre-existing program, at the time of the Agreement, whereby it *planned* to raise their APR if certain risk factors appeared in their credit history.

**[7]** But even if Chase did maintain such a program,[7] the language of comment 11 would not require its disclosure. We agree with Chase that it must be able to adjust the price of credit according to how risky it is to lend to a given cardholder. Indeed, the risk of the cardholder—the likelihood he or she will fail to pay off credit balances—is a basic element in the price of credit. In this sense, "adverse action re-pricing" is simply a way of describing the normal way a credit card company prices its product. Not only will the facts that make a cardholder risky emerge over time, but their importance to Chase may vary as market conditions fluctuate. For example, just a few years ago creditors were much less wary than they appear to be today of cardholders and other loan recipients who carry high levels of debt. As a credit card company's liquidity decreases, it may suddenly decide to curb the cardholders to whom it had happily given the car keys only the previous year. These decisions do indeed reflect judgments that creditors make more than they do specific, triggering events which creditors know in advance "may result in [an] increased [APR]." 12 C.F.R. Pt. 226 Supp. I., par. 6(a)(2), cmt. 11.

## B

**[8]** Comment 11, however, does not exhaust the requirements that Chase had to meet. Regulation Z also requires that creditors disclose any APR "that *may* be used to compute the finance charge," and that they do so "clearly and conspicuously." 12 C.F.R. §§ 226.6(a)(2) & 226.5(a)(1) (emphasis added).

---

[7]Because we are at the Rule 12(b)(6) stage, we take this allegation as true.

The point is not that Chase had to disclose every factor relevant to the APRs it imposed or that it reserved the right to change the agreement; neither the Act nor Regulation Z requires such disclosures. Moreover, we have recently rejected the notion that credit card companies must disclose more than what the laws actually require in order to avoid liability for some type of "bait-and-switch." *See Hauk*, 552 F.3d at 1122 ("We hold that a creditor's undisclosed intent to act inconsistent with its disclosures is irrelevant in determining the sufficiency of those disclosures under sections 226.5, 226.6, and 226.9 of Regulation Z."). Rather, the question is what disclosures Chase must have made in order to disclose clearly and conspicuously what Regulation Z does demand: namely, any APR "that *may* be used." 12 C.F.R. § 226.6(a)(2) (emphasis added).

1

**[9]** We have yet to determine the meaning of the word "may" in subsection 226.6(a)(2), but one of our sister circuits has done so. In *Rossman v. Fleet Bank*, the Third Circuit rejected the argument that the word means "might ever be" at some future date, because Regulation Z explicitly contemplates that creditors will make changes to an agreement "that do not affect the accuracy of a previous disclosure." 280 F.3d at 392. (citing provisions of Regulation Z and the Act) (emphasis omitted). Instead, it held that "may" means "is permitted to" by the agreement at issue. *Id.* at 393. *Rossman* pointed to the Board's comment, albeit in reference to a different subsection of the regulation, that "[t]he disclosures should reflect the credit terms to which the parties are *legally bound at the time of giving the disclosures*." *Id.* at 391 (quoting 12 C.F.R. Pt. 226, Supp. I § 5(c), cmt. 1) (emphasis added). In light of that observation, the Third Circuit concluded that "may" in this context connoted permission, not possibility. *Id.* at 393.

**[10]** We are persuaded by this interpretation. Although our recent *Hauk* opinion disagreed with the reasoning of *Rossman*

in some respects, *see Hauk*, 552 F.3d at 1121-22, it confirmed that "our circuit has focused on subsection 226.5(c)'s requirement that disclosures 'reflect the terms of the legal obligation between the parties,' " *id.* at 1121. Our interpretation of subsection 226.6(a)(2) is consistent with full disclosure of contractual terms. Creditors, including Chase, therefore violate subsection 226.6(a)(2) when they do not disclose in an agreement any APR that such agreement permits them to use.

2

Chase argues that the Agreement permitted it to change the Barrers' APR on the basis of risk factors that it discovered in their credit history, by virtue of the reservation of the right to change terms ("change-in-terms provision"). Furthermore, Chase contends that the disclosure of that contractual right, coupled with the disclosure that Chase would periodically review credit history, meets its disclosure obligation under subsection 226.6(a)(2).

a

**[11]** We are persuaded that Chase adequately disclosed the APRs that the Agreement permitted it to use simply by means of the change-in-terms provision. That provision reserved Chase's right to change APRs, among other terms, without any limitation on why Chase could make such a change. The provision thus disclosed that, by changing the Agreement, Chase could use any APR, a class of APRs that logically includes APRs adjusted on the basis of adverse credit information. Apart from the gloss of Comment 11, neither the Act nor Regulation Z require Chase to disclose the basis on which it would change or use APRs.[8] Therefore the failure to dis-

---

[8]The Barrers point to the language of subsection 226.6(a) requiring disclosure of "[t]he circumstances under which a finance charge will be imposed and an explanation of how it will be determined." But that phrase is immediately followed by the words, "as follows," and a list of specific requirements. Thus, only the items enumerated in the list must be disclosed. Disclosure of the basis for increases in a periodic rate (such as an APR) is not on that list.

close the reason for the change to the Barrers' APR—adverse credit information—and that Chase would look up their credit history to acquire that information does not undermine the adequacy of Chase's disclosure.[9]

---

[9]Although we construe the Act liberally in favor of the consumer, *see Jackson*, 890 F.2d at 120, this does not protect against every sharp credit practice. We have emphasized that the Act "is only a disclosure statute and does not substantively regulate consumer credit but rather requires disclosure of certain terms and conditions of credit." *Hauk*, 552 F.3d at 1120 (internal quotation marks omitted). The Barrers might argue that a general change-in-terms provision is an inadequate disclosure of the terms of an agreement, because it fails to communicate the implications of those terms. Such a characterization, however, is neither natural nor compelled. We decline to adopt it because it amounts to a challenge to a substantive term in the agreement, namely the general change-in-terms provision, for such provisions would be effectively illegal if creditors had to specify the general circumstances under which they anticipated changing terms.

Furthermore, we recently concluded that "a creditor's undisclosed intent to act inconsistent with its disclosures is irrelevant in determining the sufficiency of those disclosures under section[ ] . . . 226.6 [of Regulation Z]." *Id.* at 1122. If that is true, it would be odd to say that a creditor's undisclosed intent to pursue a particular a course of action *consistent* with its disclosures, though somewhat more specific than the general policy that was disclosed, was not only relevant to determining the sufficiency of those disclosures, but actually causes them to violate section 226.6.

Finally, Judge Graber worries that our interpretation would open the door for creditors to adjust the terms of a credit agreement for such bizarre reasons as the color of the cardholder's hair. *See* Partial Dissent at 6008. We do not have such a freakish fact pattern before us, but we doubt that Regulation Z would permit a creditor to use a general change-in-terms provision to punish a cardholder on any whim whatsoever. Recall that Comment 11 requires the disclosure of the "specific event or events that may result in the increased rate." 12 C.F.R. Pt. 226 Supp. I, par. 6(a)(2) cmt. 11; *see also supra*, at 6000-02. Our conclusion that Comment 11 does not require the disclosure of risk-based pricing rests, in part, on the fact that pricing credit on the basis of cardholder risk is how credit card companies normally do business. Clearly, the same could not be said for pricing credit on the basis of hair color or any other peccadillo that might offend some over-punctilious creditor.

b

**[12]** Even so, such disclosure must be clear and conspicuous. 12 C.F.R. § 226.5(a)(1); 15 U.S.C. § 1632(a). Neither the Act nor Regulation Z define clarity and conspicuousness in this context. The Staff Commentary explains only that "[t]he clear and conspicuous standard requires that disclosures be in a reasonably understandable form." 12 C.F.R. Pt. 226, Supp. I, par. 5(a)(1), cmt. 1. The same standard for clarity and conspicuousness also appears in other areas of commercial law, which matters because "[w]hen a federal statute leaves terms undefined or otherwise has a 'gap,' we often borrow from state law in creating a federal common law rule." *See Am. Gen. Fin., Inc. v. Basset (In re Bassett)*, 285 F.3d 882, 884-85 (9th Cir. 2002). Under the Uniform Commercial Code, a term is considered conspicuous when it is "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." U.C.C. § 1-201(b)(10). We borrowed from this definition in the context of the Bankruptcy Code, which also requires certain disclosures to be "clear and conspicuous" without defining that term, concluding that "conspicuousness ultimately turns on the likelihood that a reasonable person would actually see a term in an agreement." *Bassett*, 285 F.3d at 886.

**[13]** Clear and conspicuous disclosures, therefore, are disclosures that a reasonable cardholder would notice and understand. No particular kind of formatting is magical, *see Basset*, 285 F.3d at 886, but, in this case, the document must have made it clear to a reasonable cardholder that Chase was permitted under the agreement to raise the APR not only for the events of default specified in the "Finance Terms" section, but for any reason at all.

**[14]** Although "[w]e decide conspicuousness as a matter of law," *Basset*, 285 F.3d at 885, we need not promulgate here a code of conspicuousness. It is enough to observe that the change-in-terms provision appears on page 10-11 of the

Agreement, five dense pages after the disclosure of the APR. It is neither referenced in nor clearly related to the "Finance Terms" section. This provision, as part of the APRs allowed under the contract, is buried too deeply in the fine print for a reasonable cardholder to realize that, in addition to the specific grounds for increasing the APR listed in the "Finance Charges" section, Chase could raise the APR for other reasons.

**[15]** Therefore, the Barrers have stated a claim because Chase cannot show that, as a matter of law, the Agreement made clear and conspicuous disclosure of the APRs that Chase was permitted to use.

### IV

For the foregoing reasons, we reverse the district court's grant of Chase's motion to dismiss for failure to state a claim and remand for further proceedings.

REVERSED and REMANDED.

GRABER, Circuit Judge, concurring in part and dissenting in part:

I concur in the opinion, with the exception of Parts III.A and III.B.2.a. To those portions of the opinion, I respectfully must dissent. Display (e.g., size and font of the print) and placement are not the only defects in the Chase Agreement. Rather, in the procedural posture of this case, I would conclude that the disclosures are not only unclear and inconspicuous, but also substantively insufficient under Regulation Z. 12 C.F.R. §§ 226.6(a), 226.5(a)(1), 226.5(c).

As the majority correctly observes, the Truth in Lending Act ("TILA") is designed "to assure a meaningful disclosure

of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). But the majority's interpretation of Regulation Z's requirements allows Chase to circumvent that goal. The majority opinion concludes that Chase's reservation of the right to change the terms of the Agreement, standing alone, constitutes adequate disclosure of every possible Annual Percentage Rate ("APR") it may use, because it discloses that Chase has a right to change the terms of the Agreement at any time, without limitation. Maj. op. at 6004-05. In other words, Chase can raise the Barrers' APR for any reason, however bizarre or unexpected, without informing them that it intends to do so. For example, under the majority's opinion, Chase has adequately disclosed that it had a preexisting plan to raise the Barrers' APR to 50% if they dye their hair red. The majority opinion would allow that result simply because Chase included in the Agreement an unrestricted change-in-terms provision.

Chase has little or no incentive to limit its own ability to change a customer's APR or to inform its customers of its plans. By failing to read Regulation Z in a manner that requires credit card companies to give meaningful information to customers, the majority effectively has let the fox guard the henhouse and has disregarded the purpose of TILA.

I would hold instead, at the pleading stage, that Chase's disclosures were not necessarily substantively adequate as a matter of law. As the opinion notes, we must take as true the allegations of the complaint, because the case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Maj. op. at 6002 n.7. Therefore, it is a given for purposes of our decision that Chase maintained a pre-existing program, at the time the Barrers entered into the Agreement, under which Chase planned to raise the Barrers' APR if certain specific risk factors appeared in their credit history: an unfavorable credit-to-debt ratio, a large number of lines of credit, or other adverse information. Those facts, which we

must deem true, required Chase to disclose—truthfully and conspicuously—that it maintained a pre-existing program under which it would raise the Barrers' APR if Chase learned of certain specific risk factors, including negative credit events that occurred *before* the extension of credit.[1] It did not do so.

Although the majority rests its conclusion about the substantive adequacy of the disclosure solely on the change-in-terms provision, maj. op. at 6004, I am uncertain that even a combination of the change-in-terms provision and the credit history monitoring term would suffice to meet Regulation Z's standards. Even if those two terms had appeared together, in large bold print, it is not clear to me that the combination would have informed the Barrers adequately that Chase could change their APR on the basis of particular types of adverse information in their credit history reports. That is, assuming that the Barrers read and understood each provision correctly, I doubt that they could be expected to put both terms together to reach the understanding that Chase and the majority deem obvious: that Chase could raise their APR based on information it receives from routine credit monitoring.[2]

In addition to ensuring fairness and allowing for comparison shopping, one reason to require disclosure is to permit

---

[1]The allegation that "Chase . . . uses [information from consumer credit reports] to deem customers in default, based on credit events that existed *prior* to the extension of credit," Complaint at ¶ 24, is particularly troubling because it suggests that Chase knew of negative credit events that would result in its raising the Barrers' APR, even before it extended credit to them at a lower rate.

[2] The requirement that I am suggesting would not be onerous. Here is one illustration: "Chase may raise your interest rate if it learns, from reviewing consumer credit reports about you, that you have opened a large number of credit accounts, that you are carrying a large amount of debt, or that your credit history is less than fully satisfactory in any other way, even if the credit reports concern events that happened before you signed this Agreement."

consumers to conform their behavior to the information—for example, to refrain from dyeing their hair red or from opening additional credit card accounts, so as to avoid an increase in their APR. In my view, the content of the Chase Agreement is too vague and general to allow a reasonable, average consumer to understand the terms and adjust his or her behavior accordingly. *Cf. Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1119 (9th Cir. 2009) (holding that an explanation was adequate when it disclosed specifically that the APR may change "if any minimum payment on any loan or account" is not made by the payment due date). Chase's broad reservation of rights, without more, cannot fulfill that purpose.

Of course, the evidence may demonstrate that there was no pre-existing program as alleged, in which case there was nothing to disclose. But we cannot make that assumption because we must deem the Barrers' allegations to be true. If there were such a program as alleged, its content would have to be disclosed both truthfully *and* conspicuously. I therefore dissent from Parts III.A and III.B.2.a.